**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.:  15-mj-02129-JG**

```
UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
v.                              )
                                )              February 11, 2015
ANDREW SAYEED MYRIE,            )
                                )
            Defendant.          )              Pages 1 - 63
_____)
```

PRETRIAL DETENTION/REMOVAL HEARING
BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                            99 NE 4th Street,
                            Suite 800,
                            Miami, FL  33132
                            BY:  OLIVIA S. CHOE, AUSA


For the Defendant:          NATHAN P. DIAMOND, P.A.
                            888 Biscayne Boulevard,
                            Suite 501,
                            Miami, FL 33132
                            BY:  MICHAEL P. DIAMOND, ESQ.


Transcribed By:             Bonnie Joy Lewis, R.P.R.
                            7001 SW 13 Street
                            Pembroke Pines, FL  33023
                            954-985-8875
                            caselawrptg@gmail.com

```
1                          I N D E X

2   WITNESS:                                        PAGE:

3
    BRIAN S. HORNE
4
    Direct examination by Mr. Diamond:              15
5
    Cross examination by Ms. Choe:                  21
6
    Redirect examination by Mr. Diamond:            23
7

8
    DAVETTA DAVIS
9
    Direct examination by the Court:                30
10
    Cross examination by Ms. Choe:                  35
11

12
    JUSTUS ARISON
13
    Direct examination by the Court:                36
14
    Cross examination by Ms. Choe:                  --
15

16
    WILLIAM PLUNKETT
17
    Direct examination by the Court:                44
18
    Cross examination by Ms. Choe:                  --
19

20
    ZOE ESPITIA
21
    Direct examination by the Court:                51
22
    Cross examination by Ms. Choe:                  --
23

24

25
```

1              (Thereupon, the following proceeding was held:)

2              THE COURT:  This is the case of Andrew Sayeed Myrie; Case

3    Number 15-02129.

4              MS. CHOE:  Oliva Choe on behalf of the United States.

5              THE COURT:  Thank you.

6              MR. DIAMOND:  May it please the Court.  Nathan Diamond on

7    behalf of Mr. Myrie who stands beside me.

8              THE COURT:  Thank you.

9              So we are here for three purposes.  We have Pretrial

10   Detention, removal, and identity.  This is a case out of -- is it

11   North Dakota?

12             MR. DIAMOND:  Yes.

13             THE COURT:  All right.  I am trying to think if I have ever

14   been to North Dakota.  I think I have in the wintertime and it was

15   very cold.

16             So are we here for all three purposes or just the

17   detention?

18             MR. DIAMOND:  Yes.

19             MS. CHOE:  Yes, Your Honor.

20             THE COURT:  All right.  Fair enough.

21             So let me hear, briefly, the grounds for the Pretrial

22   Detention request.

23             MS. CHOE:  Thank you, Your Honor.

24             Yes, if I may, the grounds are based on risk of flight.

25   And may I proceed by proffer with the facts pertaining to all the

1 issues for today?

2            THE COURT:  Yes.

3            MS. CHOE:  So since as early as January 2009, investigation

4 has revealed that a number of individuals in the U.S. and in Jamaica

5 conspired with one another to defraud typically elderly victims

6 throughout the United States in what is commonly known as a lottery

7 scam.

8            In essence, a number of individuals in Jamaica, including

9 Lavrick Willocks and several other individuals who have been

10 indicted in a separate indictment in the same district in North

11 Dakota, conspired with one another to target elderly and

12 particularly vulnerable individuals by calling them and advising

13 them that they had won a large sum of money.

14            In some instances, these calls were made and the person

15 calling indicated to the victims that they were working with the

16 FBI, or some other government agency.  The victims were advised that

17 in order to receive this award of a large sum of money, they needed

18 to pay a fee.

19            The victims would be instructed to pay the fee by

20 transferring the money to certain co-conspirators who were located

21 in various places in the United States, including here in the

22 Southern District of Florida.

23            The victims would, then, typically begin transferring

24 money.  The victims would, then, make multiple transfers over time

25 as the co-conspirators called and indicated that they needed to send

1 still more.  The money would be transferred by the victims, you

2 know, by wire transfer, by check, by multiple means.

3      These co-conspirators, who were located throughout the

4 United States in turn, then, transferred the money that they had

5 received from victims to individuals in Jamaica and those transfers

6 were effected again through a number of means.

7      In some instances by wire transfers.  In some instances by

8 physically carrying cash to Jamaica.  In some instances by

9 individuals in Jamaica coming to the United States and picking up

10 cash and taking it back.

11      Today investigators have identified over 70 victims, some

12 of whom lost all of their savings, or who were threatened if they

13 didn't pay.  I would note that the harm in this case, while not

14 physical, one victim did commit suicide and another considered

15 suicide when not able to pay for a very sick cancer stricken

16 relative.  And the losses in the conspiracy to date total over five

17 million dollars.

18      THE COURT:  Are some of the victims out in the audience

19 here today?

20      MS. CHOE:  I don't believe so.

21      THE COURT:  All right.

22      MS. CHOE:  Not to my knowledge.  They are located in places

23 all over the United States.

24      In 2013 an individual named Charles Bauder who is in Texas

25 and who, oddly, was originally a victim of this scheme and then

1  became a co-conspirator, received money from a number of victims who

2  had been contacted by these callers.  He transferred the proceeds

3  that he received to Lavrick Willocks, the individual that I named

4  before and other co-conspirators.

5          Specifically, on November 21st of 2013, Bauder who has

6  since pled guilty, deposited a $105,000 cashier's check from a

7  victim into a bank account and, then, withdrew the entire amount in

8  cash.  And I would note that that victim who provided that $105,000,

9  which is at issue here, was in total defrauded of over $400,000 as a

10 result of this scam through repeated payments.

11         Bauder took the $105,000 in cash and, then, he provided it

12 via a mutual friend to somebody named Deon-Ville Antonio O'Hara,

13 also known as ZJ Wah Wa, who is another co-conspirator in the case,

14 who is an associate of the Defendant, as you will hear, of Mr. Myrie

15 and who has also since pled guilty.

16         On November 28th a week later, O'Hara, who received the

17 $105,000 in cash, flew to Jamaica carrying that cash, which he did

18 not declare.  He was stopped by Jamaican Customs authorities and the

19 cash was seized.

20         At the time, he told Jamaican law enforcement that he

21 received the money in the U.S. as part of a music contract.  It was

22 payment, which he was supposed to deliver to somebody in Jamaica,

23 but he has since advised law enforcement that the funds were, in

24 fact, supposed to be delivered to Willocks, this person I mentioned

25 at the beginning, as part of the lottery scam.

1        After O'Hara arrives and that money is seized, the

2   Defendant Andrew Myrie assisted O'Hara in attempting to recover

3   those fraudulently obtained funds.  Myrie specifically produced a

4   letter on the letterhead of his music production company, which is

5   Up-Tempo International Music Records or UIM.

6        In the letter he stated he had a contract with Bauder, the

7   guy in Texas who had originally gotten the money and that O'Hara was

8   supposed to be delivering it from Bauder to Myrie.  He also produced

9   a fake contract that was supposedly between UIM and Bauder to say

10  that that was why he was getting this deposit of $105,000.  Notably,

11  for purposes of identity, Myrie also provided a copy of his Jamaican

12  driver's license.

13       Now, O'Hara, the guy who arrived with the money, he

14  e-mailed a copy of Myrie's Jamaican driver's license to an e-mail

15  account utilized by Willocks.  And that same account e-mailed

16  documents to Bauder, the guy in Texas.  Bauder, then, signed the

17  fraudulent contract and a letter and all of these things are sent

18  back to Jamaica.

19       And this entire package of the fraudulent contract, the

20  fraudulent letter, and Mr. Myrie's Jamaican driver's license are

21  provided to Jamaican Customs in an attempt to say, look, this money

22  should be legitimately coming to Mr. Myrie.  Jamaican authorities

23  did not release the money.

24       Instead, in July of 2014, as the Court sees from the

25  indictment, Mr. Myrie was charged by Federal Grand Jury in the

1 District of North Dakota, along with others relating to this fraud.

2 It was a sealed indictment.

3          And on February 9th, Mr. Myrie flew into the United States

4 from Jamaica landing at Miami International Airport.  He was

5 carrying the same driver's license that was provided to Jamaican

6 Customs authorities as alleged and he was also carrying a passport.

7          I would note that, as the passport shows, while he does

8 have a tourist visa issued to him permitting entry into the United

9 States, he was not admitted pursuant to that visa because there was

10 a pending arrest warrant and he was, instead, paroled in for

11 purposes of prosecution.  So he is not legally present in the United

12 States, except for purposes of prosecution.  And as a result, an

13 immigration detainer has been lodged against him.

14          Now, following his arrest at the airport, Mr. Myrie was

15 advised of his Miranda rights, which he waived in writing.  He

16 admitted that he knows O'Hara, the fellow who arrived with the cash.

17 And although it took him a while, he initially insisted this was for

18 a music contract.

19          He did, ultimately, admit that he had signed the fraudulent

20 letter and contract between him and Mr. Bauder that was submitted to

21 Jamaican Customs authorities.  He admitted that the largest contract

22 he had ever signed for with his music business was $10,000, even

23 though this cash was somehow for $105,000.  And that he, ultimately,

24 admitted that the money was not really part of any business

25 transaction, but had been provided so O'Hara could get the money

1  that Jamaican Customs had seized.

2          As the Court may be able to tell from the indictment -- I

3  have a copy of the related indictment involving O'Hara, Bauder, and

4  Willocks -- this is a scheme that has been ongoing for years and

5  continues to be ongoing.  So that is the Government's factual

6  proffer.

7          I do have copies of the letter that I referred to, as well

8  as the I.D.  During his post Miranda interview, the Defendant did

9  sign the letter and the contract saying that he had written them and

10 he also provided a written statement.  And I can present argument as

11 to identify and detention now or after Defense proceeds.

12         THE COURT:  Would you like the opportunity to question the

13 witness?

14         MR. DIAMOND:  I would, Your Honor, but more importantly and

15 before we even start, this has been somewhat troubling to me since

16 it happened Friday night.  When Mr. Myrie came through the airport,

17 I received a phone call from family members, or friends of family

18 members advising me of the facts of the case.

19         And then, when I started to investigate the case and find

20 out what it is, I frankly don't see any crime committed in the

21 United States for which this Court or any other court would have

22 jurisdiction, particularly as outlined in the indictment.

23         I got the indictment the other day from the Court and I

24 read through it.  And yes, these are disturbing events that were

25 taken place by other people in different jurisdictions throughout

1   the United States without the participation of Mr. Myrie or without

2   his knowledge.

3           But when you get down to it and you look through to

4   Paragraph Number 60, that's where it all begins where O'Hara starts

5   to talk to Mr. Myrie.  O'Hara gets arrested in Jamaica.  Not in the

6   United States.  He is already outside the United States.  The monies

7   have already been seized by the Jamaican authorities.  The monies

8   that he was carrying that are purported to be the proceeds of the

9   fraud, they're sitting with Jamaican authorities.

10          So, if anything, jurisdiction would be in Jamaica if, in

11  fact, any of the facts that are subsequently related are, in fact,

12  correct.  That's for openers.  So I think that's a major issue to

13  begin with.

14          THE COURT:  Well, let me interrupt you, if I can.  Well,

15  not interrupting you, but let me respond.

16          The case is already indicted.  So I hear what you are

17  saying.  Your position is that the Court does not have any

18  jurisdiction because there is no federal crime in the United States.

19  So I hear that argument.

20          What is it, Mr. Diamond, that you would like me to do?  Do

21  you want me to dismiss an indictment return in North Dakota based on

22  your argument that there is no U.S. crime committed?

23          Do you want me to just sort of observe and note the facts

24  that maybe there is not a crime and factor that into the detention

25  analysis that the strength of the Government's case is not that

1 strong, even though there has been an indictment?

2        Do you just want me to nod my head and say that is an

3 interesting argument?

4        What exactly is it you want me to do?

5        MR. DIAMOND:  Point number two, I will ultimately deal with

6 that issue, but I don't want it to be held against Mr. Myrie in this

7 jurisdiction or any other that I am even submitting to the

8 jurisdiction of the Court.  That's all I'm saying.

9        THE COURT:  I understand your need to do that.  I

10 understand what you are doing.

11        The record will reflect that your client is not waiving his

12 jurisdictional argument.  To the contrary.  He is affirmatively

13 challenging it.  He is taking the position that there is no crime.

14 He is taking the position that the indictment is legally wrong.  You

15 are covered.  You made your record.

16        All right.  So now, let's talk about the issues that are

17 here today; identity, removal, and the detention.

18        MR. DIAMOND:  Well, identity, in effect, after I received

19 certain documents from the prosecution, the passport and driver's

20 license that was submitted upon entry into the United States -- and

21 again, I have issue in the manner in which the parole took place,

22 but that I'll take up in another court in requesting bond from them

23 in that Mr. Myrie, had he been allowed to take ten steps further

24 would have been there, but they caught him on the -- what do you

25 call it -- the gateway of the airplane and took him to a separate

1    office.

2              So that was him walking off the plane.  In terms of whether

3    or not that's him named in the indictment, I don't know if they have

4    a witness or not as it relates to that.

5              THE COURT:  So you are challenging the identity issue and

6    you are putting the Government to its proof?

7              MR. DIAMOND:  At this point in time, yes.

8              THE COURT:  All right.  Is there a witness here that is

9    going to establish identity?

10             MS. CHOE:  Yes, Your Honor.  The United States calls postal

11   inspector Brian Horne.

12             THE COURT:  Well, we will get there in just a minute.  I am

13   just going step by step.  There is a witness here to address that

14   issue.  All right.

15             MR. DIAMOND:  And then, the last point would be as relates

16   to the facts that were related to the Court in terms of

17   participation of Mr. Myrie in the manner as it was related to the

18   Court.

19             And that is that, yes, there were people doing this.  No

20   doubt there were people who sent monies to other people, that they

21   were not Mr. Myrie, that he had nothing to do with that aspect of

22   it.  That, I guess, is where the removal -- I mean, excuse me -- the

23   detention part would go to that.

24             THE COURT:  All right.  Fair enough.

25             So it sounds like you want the opportunity to question the

1  Government witness.  And then, you said it was a postal inspector,

2  issues relating to identity, which I always call that

3  identity/removal.

4         MR. DIAMOND:  Right.

5         THE COURT:  And then, also, to the extent that you want to

6  get into some issues relative to the Pretrial Detention issue,

7  keeping in mind that this is already an indicted case out of another

8  district.  So this is a limited, at best, opportunity there.

9         MR. DIAMOND:  And I appreciate that.

10        And the point is, I have been in communication with the

11 assistant that is handling the case there.  In fact, I just recently

12 spoke, or was texting with an attorney that was communicating with

13 Mr. Claire --

14        MS. CHOE:  Hochhalter, I think.

15        MR. DIAMOND:  Hochhalter.

16        And his big concern was that if he gets -- if Mr. Myrie

17 gets bail here, he will go to Krome.  And then, Krome will send him

18 out of the country.

19        I don't understand that thinking.  Perhaps they don't have

20 enough experience in that manner in North Dakota, but certainly a

21 bail from this Court would only release him from this Court to Krome

22 and certainly, we have the opportunity and the ability to request

23 bail from there.  Particularly, when the Court hears the ties to the

24 community that we would have before this Court.  There are very

25 substantial ties to this community.

1    One person flew down privately so that he could be here for

2 this hearing.  Someone who has known Mr. Myrie since he was about

3 three years old flew in personally to speak on his behalf and say he

4 would be responsible for Mr. Myrie.

5    There are probably a half a dozen people who will speak on

6 behalf of Mr. Myrie and willing to pledge and offer him residence

7 under any conditions that this Court wishes to set so I can

8 effectively deal with the issues in a much easier way.  Because I

9 understand, also from talking to local counsel in North Dakota, the

10 Detention Center is not like the Detention Center here where I could

11 look out the window and see it.

12    The Detention Center, which is in Bismark, is two

13 and-a-half hours out of Bismark.  So I would have to fly to Bismark

14 in terms of trying to prepare a defense for Mr. Myrie.  And in fact,

15 in my opinion, that would be denial of due process, but at least he

16 would be on bail pursuant to whatever conditions this Court can set,

17 or wishes to set.

18    And then, I can have him close by.  We can travel, with

19 permission of Court, consistent with terms of release to any other

20 courts that he may have to appear at.

21    THE COURT:  So I think I am getting a little bit of a

22 preview of your closing argument, so to speak, because right now I

23 am going to give you the opportunity to question the witness, which

24 I assume you want to do?

25    MR. DIAMOND:  Yes.

1          THE COURT:  All right.

2 (Witness sworn.)

3          THE COURTROOM DEPUTY:  State your name for the record and

4 spell your last name, please.

5          THE WITNESS:  Brian Scott Horne; H-O-R-N-E.

6               BRIAN SCOTT HORNE, DEFENSE WITNESS SWORN

7                         DIRECT EXAMINATION

8 BY MR. DIAMOND:

9 Q.   And how are you employed, sir?

10 A.   I'm a United States postal inspector.

11 Q.   And what is your involvement in the prosecution of the United

12 States versus Andrew Myrie?

13 A.   I've been involved with the case ultimately from its inception

14 almost since 2012.

15      I began investigating the case and sent some subpoenas to some

16 banking institutions.  They informed me that there was another

17 investigator, FBI Special Agent Frank Gasper of North Dakota, who

18 was subpoenaing the same information and that I should be in touch

19 with him.  He and I have been in communication since approximately

20 the spring or summer of 2012 and have been investigating this case

21 since that time?

22 Q.   And did you author reports?

23 A.   I'm sorry?

24 Q.   Did you author reports?

25 A.   Yes, I have.

1      MR. DIAMOND:  I would ask the Court to allow me to review

2  those reports.

3      THE COURT:  Do you have any of those reports here?

4      THE WITNESS:  I don't have any reports on me today, no.

5  BY MR. DIAMOND:

6  Q.   Did you author reports as they related to the charges contained

7  within the indictment?

8  A.   I have not written any reports, to my knowledge, specifically

9  concerning Mr. Myrie.

10 Q.   And you are an experienced postal inspector, correct?

11 A.   Yes.  I've been employed with the Inspection Service since

12 2005.

13 Q.   Since 2005.  And you continued on with this investigation until

14 the indictments that came out in -- when?  2014?  The original

15 indictment?

16 A.   Yes.  And then, one original and I think two or three

17 superseding.

18 Q.   There were some, at least, 20 people in one indictment,

19 correct?

20 A.   I don't know the specific number, but there are numerous

21 defendants.

22 Q.   None of those three previous indictments charged Mr. Myrie,

23 correct?

24 A.   I think Mr. Myrie was involved with the last superseding

25 indictment.

1   Q.    The very last one, correct?

2   A.    Yes.

3   Q.    And in that one, the facts laid out basically talk about a

4   transaction that took place with this -- I call him ZJ Wah Wa

5   O'Hara, correct?

6   A.    Yes.

7   Q.    And ZJ Wah Wa was the one that was active in the United States

8   and participating in the United States, correct?

9   A.    He was in Jamaica, a resident of Jamaica, but he would fly back

10  and forth picking up money and taking it to Jamaica.

11  Q.    Okay.  And you have no indication that any of that money went

12  to Mr. Myrie, correct?  Other than -- well, none of it went to Mr.

13  Myrie because $100,000 wound up with the Jamaican Government,

14  correct?

15  A.    I have no specific individual knowledge that Mr. Myrie received

16  any of the money.

17  Q.    So basically, the answer is correct, he did not receive any

18  money because you investigated this for the past, what, six years?

19  A.    My investigation is that I can't show that he did receive any

20  actual monetary instruments or money.

21  Q.    And you've been in touch with the Jamaican authorities, have

22  you not?

23  A.    Yes.

24  Q.    And you also found out, I guess, you are familiar, are you not,

25  with the Area 5 Headquarters Crime Office in Jamaica?

```
 1  A.   I worked in Jamaica for six months.  I'm familiar with Jamaican
 2  Police Department, the JCF.  As far as the specific areas, I don't
 3  know the specific areas or the buildings.
 4  Q.   You dealt with the police down there?
 5  A.   I'm sorry?
 6  Q.   Did you deal with the police there?
 7  A.   Yes.
 8  Q.   And you made them aware of the people that were under
 9  investigation by you, correct?
10  A.   Yes, I have -- they have been assisting us as well.
11  Q.   And did you learn that in July of 2014, Mr. Myrie reported the
12  theft of his identity to the Jamaican police before this incident
13  ever with Mr. Wah Wa or O'Hara?
14  A.   This is the first I'm hearing of any report of an identity
15  issue in Jamaica.
16  Q.   You're not saying that it didn't occur, are you?
17  A.   I don't know if it did or not.  I'm unaware of it.
18  Q.   Let me show you a letter of a witness statement.
19          MS. CHOE:  May I see it, Your Honor?
20          MR. DIAMOND:  I'm sorry.
21          THE COURT:  The answer is, yes, you may.
22          MS. CHOE:  Thank you.
23          MR. DIAMOND:  I'm sorry.  I have a copy.
24          MS. CHOE:  That's okay.
25          MR. DIAMOND:  May I approach?
```

```
 1          THE COURT:  Sure.
 2 BY MR. DIAMOND:
 3 Q.   I'll show you what I'll mark for identification purposes of
 4 this hearing and ask you if you recognize this witness statement
 5 provided to the Jamaican Police?
 6 A.   I have -- this is the first time I've seen this document.
 7          THE COURT:  Mr. Diamond, bear with me for just a minute
 8 because if I am going to read I cannot listen to the next question.
 9          So sir, if you would just relax on the witness stand for a
10 minute or two.  And I was about to say take a breather, but it is a
11 little too hot in here to take an effective breather.  So bear with
12 me for just a minute.
13 BY MR. DIAMOND:
14 Q.   For the record, you've had an opportunity to review it and you
15 saw that this was a statement that was given in July of 2014 before
16 the incident complained of in the indictment, correct?
17 A.   Can I see the document?
18 Q.   Yes.  I'm sorry.
19          THE COURT:  Well, Mr. Diamond, you do not need to bother
20 because the witness cannot say that this statement was, in fact,
21 given to the Jamaican Police on July 25th.
22          All he can say is, yes, that is the date that is on the
23 document.  I have seen it and that is the date that is on it.  So
24 let's move on.
25 BY MR. DIAMOND:
```

1  Q.    When Mr. Myrie came into the United States, he had a valid

2  tourist visa, correct?

3  A.    That is my understanding.  I was not present at the airport.  I

4  did not arrest Mr. Myrie.  So I have no independent recollection,

5  but that is my understanding.

6  Q.    Did you participate in any of the activity last Friday night at

7  the airport?

8  A.    No, I did not.

9  Q.    You were not there when any purported rights were read to him?

10  A.    No, I was not.

11  Q.    Or any statements that you just heard the prosecutor talk

12  about, were given?

13  A.    No, I was not present.

14  Q.    You've had an opportunity to review this?

15  A.    Yes.

16  Q.    And in fact, none of those indicate that he had any knowledge

17  or ability to know what was going on with Wah Wa and the rest of the

18  people that were indicted in North Dakota or elsewhere?

19  A.    He does make certain admissions that he did submit those

20  documents to the Jamaican Customs in an attempt to obtain the

21  $105,000 that was seized.

22  Q.    To have helped his friend?

23  A.    That's what he says, yes.

24  Q.    Okay.  Not that it was part of proceeds that he was told were

25  part of a scam?

1  A.    Correct.

2  Q.    So there is no mention of his knowledge about the scam, that he

3  knew that Wah Wa was a record producer, a DJ, same business he is in

4  and he was looking to help his friend?

5  A.    That's what he says, yes.

6  Q.    Not that he was involved in any scam, correct?

7  A.    (No audible response.)

8  Q.    That he wasn't doing any telephoning, telling people that they

9  were winning the lotto, or anything along those lines, correct?

10 That never occurred?

11 A.    I don't believe that he made any admissions that he was doing

12 that.

13 Q.    Okay.

14        MR. DIAMOND:  I don't have anything further.

15        THE COURT:  Does the Government have any additional

16 testimony that you would like to bring forth through this witness?

17        MS. CHOE:  Yes, Your Honor.  A few questions, please.

18        THE COURT:  Sure.

19        MS. CHOE:  Thank you.

20                        CROSS EXAMINATION

21 BY MS. CHOE:

22 Q.    Just a point of clarification.  You've been a postal inspector

23 for how many years?

24 A.    Since August of 2005.  So approximately nine and-a-half.

25 Q.    But your investigation in this case, you testified, began in

1  the spring of 2012; is that correct?

2  A.   Yes.

3  Q.   So your investigation has been going on for approximately two

4  years now and not six years; is that right?

5  A.   Correct.  Since 2012.

6  Q.   Now, the letter or statement that you were shown by Mr. Diamond

7  was dated May of -- I'm sorry -- July of 2014; is that correct?

8  A.   I believe that was the date on it, yes.

9  Q.   Mr. O'Hara flew into Jamaica with $105,000 that we're talking

10 about in 2013; is that correct?

11 A.   That is correct.

12 Q.   And the letters that Mr. Myrie fabricated in the contract were

13 ordered submitted to Jamaican authorities shortly thereafter,

14 correct?

15 A.   That is correct.

16 Q.   So that was several months before July of 2014?

17 A.   That is correct.

18 Q.   And you're aware that Mr. O'Hara, the co-conspirator has been

19 arrested and has pled guilty; is that right?

20 A.   That is correct.

21 Q.   And he was, in fact, arrested in May of 2014; is that right?

22 A.   Yes.  I was present during that arrest.

23 Q.   So that was just shortly before Mr. Myrie allegedly provided

24 the statement to Jamaican authorities; is that right?

25 A.   Correct.

1  Q.   And you were asked whether Mr. Myrie admitted in his post

2  Miranda statement that he was a scammer.  Do you recall that?

3  A.   Yes.

4  Q.   He didn't actually admit at the beginning that the contract and

5  letter were fake, did he?

6  A.   No, he did not.

7  Q.   It took him a while to admit that, correct?

8  A.   Correct.

9  Q.   But he did ultimately admit it, right?

10  A.   Yes, he did.

11  Q.   And he did admit knowing a number of people in Jamaica who are

12  involved in lottery scams, correct?

13  A.   That is correct.

14  Q.   As his associates and friends?

15  A.   Yes.

16          MS. CHOE:  No further questions, Your Honor.

17          THE COURT:  All right.  Mr. Diamond, only as to the new

18  areas that were brought up and that is all you are allowed to

19  question about.

20          MR. DIAMOND:  Just clarification.

21          THE COURT:  I understand.

22                          REDIRECT EXAMINATION

23  BY MR. DIAMOND:

24  Q.   You showed him the letter, correct?  And the contract?

25  A.   I was shown that.  I was not present, but he was shown those

1  documents, yes.

2  Q.   The documents that you're discussing by way of statements, the

3  notes that he wrote on those, correct?

4  A.   I believe he prepared a statement as well is my understanding.

5  Q.   And in that statement, that statement simply says that he was

6  trying to help his friend who was in trouble and now he is in

7  trouble?

8  A.   Can I review the --

9  Q.   Absolutely.

10 A.   -- document?

11         MR. DIAMOND:  Make this Defendant's 2.

12         THE WITNESS:  And can you repeat your question, again,

13 please?

14 BY MR. DIAMOND:

15 Q.   That he says that all I was trying to do was help my friend by

16 signing a contract and the letter?

17 A.   That is correct.

18 Q.   Not that I knew that they were scammers and they were in any

19 type of lottery scam, or anything like that, correct?

20 A.   Correct.

21 Q.   It's not anywhere in any of this, correct?

22 A.   Not in this statement that I'm looking at, no.

23 Q.   And you didn't overhear him say that, did you?

24 A.   No, I was not present.

25         THE COURT:  Can I see that, sir?

1         Thank you.  Bear with me just a minute, please.

2         Could you please pass back that document to Mr. Diamond?

3         All right.  You may step down.  Thank you.

4         Just so I am clear on what's going on here, you are not

5    challenging the identity, correct?

6         MR. DIAMOND:  No.

7         THE COURT:  So now, we are just dealing with the

8    Government's pretrial request and I will entertain argument, first,

9    from the Government.

10        MS. CHOE:  Thank you, Your Honor.

11        As I said at the beginning, the Government seeks detention

12   based upon risk of flight and we believe that by a preponderance of

13   the evidence, Mr. Myrie shows he's a risk of flight.

14        He has no legal status in the United States, except for

15   being paroled in for the purposes of prosecution.  He may have been

16   issued a tourist visa by the State Department previously, but once

17   an arrest warrant was issued for him and he arrived, he is not here

18   on that visa.

19        If he were released on a bond, he would be sent to Krome.

20   I don't think extradition to Jamaica is an unusual thing.  And

21   particularly, since the only reason he is in the United States is in

22   order to be prosecuted.

23        In addition, Mr. Myrie does not appear to have significant

24   argument, really anything more than minimal ties to the Southern

25   District of Florida.  During his post Miranda interview, he did

1  advise the agents he does not really know anyone in Miami other than

2  one friend.

3         He does, however, have significant ties outside of the

4  Southern District of Florida.  He resides in Jamaica.  That's where

5  he works.  His family, including his mother, father, and five

6  siblings all live in Jamaica.  He did advise that he has a

7  girlfriend, but she is in California, apparently in Los Angeles.

8  She is from Jamaica, but does not live in Florida.

9         THE COURT:  Sorry to interrupt you.

10         Let me ask you a question.  For purposes of ties to the

11  community, what is relevant?  Ties to the South Florida community or

12  ties to North Dakota where the charges are pending, or both

13  jurisdictions?

14         MS. CHOE:  As a practical matter, I would probably say

15  both, but I think that while I do nor have a case, I think

16  technically, probably what the Court is deciding right now is ties

17  to the Southern District of Florida.  As far as ties to North

18  Dakota, I think it's probably fair to say there are none.

19         THE COURT:  So I am going to hear from Mr. Diamond on his

20  argument.

21         On this one legal point, Mr. Diamond, which is ties to the

22  community.  In your view, as defense counsel, what is the relevant

23  analysis?  Your client's ties to North Dakota, your client's ties to

24  South Florida, or both?

25         MR. DIAMOND:  I say to the plaintiff in this case, to the

1  United States, I've been in too many jurisdictions where you find

2  and a Wah Wa who says I want to cooperate, say in New York, but they

3  go you can do it all in Florida.  And they go, well, we're not in

4  Florida.

5          We're enforcing laws throughout the United States.  So I

6  think it's to the United States and I think it's to both.  And I

7  think when the Court hears from the sureties, or the people who

8  would very happily act as sureties in this case, it's international.

9          THE COURT:  So the answer to the question is you think it

10 ties to the whole country?

11         MR. DIAMOND:  Yes.  I'm guessing because what's happening,

12 we're going to go to North Dakota from here.  If the Court is going

13 to -- we have waived removal or we will be waiving removal, he's

14 going to get to North Dakota.

15         And when we get to North Dakota, he's going to go through

16 this process again.  I'm going to have to do the same thing again.

17 But I think for this purpose to get him to North Dakota, he is

18 entitled to a bond and he's entitled to a bond, I think, throughout.

19 He's entitled to a bond throughout the entire proceedings.

20         And that is the reason I'm here today.  That is why we have

21 people fly in from as far away as Jacksonville who live down in the

22 Keys who felt that strongly that he is not a risk of flight.

23         MS. CHOE:  Your Honor --

24         THE COURT:  Thank you for answering that one question.

25         Go ahead.

1          MS. CHOE:  So I would just note, I think it's definitely
2  not the entire United States.  It's one or both of the districts at
3  issue.

4          In any event, as I noted, the Defendant has resided in
5  Jamaica and previously resided, not in the Southern District of
6  Florida or the District of North Dakota, but in Orlando and in
7  Canada.

8          In addition, Mr. Myrie has extensive foreign travel.
9  Obviously, I believe primarily to and from Jamaica.  And the
10  passport, which was seized at the time of his arrest, of which I
11  have copies, shows travel in 2014 to the United Arab Emirates,
12  possibly more than once.

13          It shows he obtained a visa for travel to China.  That visa
14  is still valid.  In 2013 travel to Panama.  And in 2012 travel to
15  Guyana, Trinidad, and Tobago and Grenada and in 2011 travel to
16  Barbados.  In addition, of course, to the fact that he resides in
17  Jamaica.

18          Mr. Myrie does, apparently, have access to assets.  I have
19  no idea what other people's assets he may be allowed to call upon,
20  but he did report, according to the Pretrial Services Report, that
21  he earns $3,000 a month and has a net worth of over $15,000.

22          And he does face a potentially significant sentence,
23  particularly for someone like him.  He does not have a criminal
24  history, I would note, according to the Pretrial Services Report.

25          And as I noted, the loss amount in the entire conspiracy

1  exceeds five million, at this point.  As far as the amount for which

2  he will be held accountable, I would leave that to the investigators

3  and the prosecutor for them to figure out.

4         The Court is aware, of course, that there was at least

5  $100,000 at issue in this particular transaction and that the victim

6  that was defrauded from that transaction and others involving

7  Bauder, Mr. Myrie's co-conspirator, was defrauded of over $400,000

8  in total.

9         And so there are, of course, vulnerable victim enhancements

10 that may be applied.  And I believe there's also an enhancement due

11 to the fact that conduct occurred outside of the United States, a

12 substantial part of it.

13        So you know, I think at a minimum the guidelines are going

14 to be 30 to 37 months at the bottom, but with the loss amount to

15 this victim, they go up to 57 to 71 months.  And of course, if we're

16 talking about the entire conspiracy, it's in the neighborhood of 15

17 to 20 years.

18        For these reasons, Your Honor, as well as the reasons

19 outlined in the Pretrial Services Report, the Government agrees with

20 Probation that the Defendant is a risk of flight and should be

21 detained.

22        THE COURT:  Thank you.

23        Mr. Diamond.

24        MR. DIAMOND:  Yes.  With regard, just starting with the

25 first person that the prosecutor talked about, Davetta Davis.

```
1              THE COURT:  I'm sorry?

2              MR. DIAMOND:  The first person.

3              THE COURT:  I know, but you stepped away from the

4    microphone to look to the back of the courtroom and I did not hear

5    the name.

6              MR. DIAMOND:  Davetta Davis.  She is in the Pretrial

7    Services Report.  Unfortunately, she was probably on the phone with

8    me when they were trying to contact her to confirm all of the

9    matters in the report.  She is present.

10             If you would, Miss Davis, stand up.

11             She lives in California.  She's employed by law enforcement

12   in California, and she fully stands behind Mr. Myrie in terms of

13   feeling that he is not a risk of flight.  Unfortunately, she doesn't

14   have assets with which to help Mr. Davis secure a bond, but we have

15   -- did Zoe come?

16             Also in the courtroom --

17             THE COURT:  Wait.  Who is Mr. Davis?

18             MR. DIAMOND:  Miss Davis.

19             THE COURT:  Okay.  Let's just take it one step at a time.

20             Ma'am, would you come on up to the podium, please.

21             Would you please swear in the witness.

22   (Witness sworn.)

23                  DAVETTA DAVIS, DEFENSE WITNESS SWORN

24                        DIRECT EXAMINATION

25             THE COURT:  Good afternoon.
```

1          THE WITNESS:  Good afternoon.

2          THE COURT:  Tell me, please, your full name.

3          THE WITNESS:  Davetta Davis.

4          THE COURT:  And Miss Davis, where do you live?

5          THE WITNESS:  I live in Los Angeles, California.

6          THE COURT:  And I heard Mr. Diamond say that you work in

7  law enforcement.  Where exactly do you work?

8          THE WITNESS:  I used to work downtown at LAPD, but I don't

9  work there no more.

10          THE COURT:  So you are no longer in law enforcement?

11          THE WITNESS:  No, I'm not.

12          THE COURT:  So do you work at all now?

13          THE WITNESS:  No, I actually I don't.

14          THE COURT:  So you are now unemployed?

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  Do you have any kind of criminal

17  history?

18          THE WITNESS:  No, I do not.

19          THE COURT:  When you say you used to work, what was your

20  job when you were working for law enforcement?

21          THE WITNESS:  I was a specialist or acted as a specialist

22  where you look up records.

23          THE COURT:  For which law enforcement agency?

24          THE WITNESS:  LAPD.

25          THE COURT:  For LAPD?

1           THE WITNESS:  (No audible response.)

2           THE COURT:  All right.  How long were you working there?

3           THE WITNESS:  A year.

4           THE COURT:  What happened?  How did it happen that you are

5   no longer working there?

6           THE WITNESS:  Temporary.

7           THE COURT:  A temporary job and that job ended after a

8   year?

9           THE WITNESS:  Correct.

10          THE COURT:  All right.  And you are willing to cosign a

11  bond?

12          THE WITNESS:  Yes.

13          THE COURT:  Well, let's talk about that.

14          I mean, I see what just happened and I don't mean to be

15  critical of it, but what happened was, I asked you a question.

16          I said, are you willing to cosign a bond?  You stopped and

17  you paused and you looked at me like a deer in the headlights.  And

18  then, you looked to Mr. Diamond.  Mr. Diamond nodded his head and

19  said yes and, then, you said yes.

20          I am not suggesting that there is anything wrong with that

21  dynamic, but it is noticeable to me.  So let's talk about that for a

22  minute.  Do you understand -- first of all, you have been here all

23  afternoon?

24          THE WITNESS:  Yes.

25          THE COURT:  You heard all the discussions that I had with

1  other witnesses about the consequences of signing off on a bond or

2  not?

3          THE WITNESS:  No.  No, I did not.

4          MR. DIAMOND:  She walked in late.

5          THE COURT:  All right.  So here is what it means to be a

6  cosigner on a bond.  What it means is that if Mr. Myrie does not

7  appear for trial or other court required hearings, you, as the

8  cosigner on the bond, are financially responsible for the full

9  amount of the bond.

10         So for the sake of discussion, if I were to impose a

11 $250,000 bond and Mr. Myrie did not show up for trial in North

12 Dakota, then, you would be on the hook for $250,000.  Even though

13 the Government has not accused you of a crime and even though you

14 have not committed any crime, you would be financially responsible

15 for $250,000 and the Government could get a judgment against you for

16 $250,000.

17         And even though you do not own any property now, that

18 judgment would be like a Sword of Damocles hanging over your head

19 and you would be looking over your shoulders for many, many years

20 with that judgment.

21         And if you ever came into any real estate, or came into any

22 money through inheritance, or you won the lottery, or some other way

23 you came into money or property, the Government would be able to

24 grab that property from you up to the amount of the judgment, which

25 in this hypothetical would be $250,000.  That is what it means to be

1 a cosigner on a bond.

2          And by the way, what is your relationship to Mr. Myrie?  Is

3 he a cousin, a relative, a friend, somebody in the music industry?

4 What is your relationship to him?

5          THE WITNESS:  I'm his girlfriend.

6          THE COURT:  All right.  For how long?

7          THE WITNESS:  About a month.

8          THE COURT:  A month?

9          THE WITNESS:  Correct.

10          THE COURT:  So you live in Los Angeles and Mr. Myrie lives

11 in Jamaica?

12          THE WITNESS:  Yes.

13          THE COURT:  And so how many times over the past month have

14 you actually been with him?

15          THE WITNESS:  I, originally, was in Jamaica.  I just came

16 back from Jamaica about two weeks ago.

17          THE COURT:  Yes.

18          THE WITNESS:  I was there since January.

19          THE COURT:  Since January of this year.

20          So you were with him for a month in January and, then, a

21 little bit here, or not?

22          THE WITNESS:  Yes, a little bit here.

23          THE COURT:  All right.  And so you have known him for how

24 long?

25          THE WITNESS:  Around a month.

1              THE COURT:  A month?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  So based on that month long

4  relationship, are you willing to be a cosigner on a bond?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  Are there any questions you want to ask,

7  Miss Choe?

8              MS. CHOE:  I just wanted to clarify, Miss Davis, is not

9  currently employed.

10                         CROSS EXAMINATION

11  BY MS. CHOE:

12  Q.   Is that correct?

13             THE COURT:  You have to answer out loud into the

14  microphone.

15             THE WITNESS:  Correct.

16  BY MS. CHOE:

17  Q.   And Miss Davis, do you own any real property or other assets?

18  A.   No, I do not.

19             MR. DIAMOND:  If I may?

20             THE COURT:  Sure.

21             MR. DIAMOND:  Let me go just go into -- and the reason I

22  called Miss Davis first is because her name was on the Pretrial

23  Services Report.  I wanted to indicate to the Court the support that

24  Mr. Myrie has.  I would like to call people with assets who've known

25  him his entire life.

```
1              THE COURT:  All right.
2              MR. DIAMOND:  The reason I called Miss Davis first was
3    because she was listed on the report.
4              THE COURT:  All right.
5              MR. DIAMOND:  They mentioned the report.
6              THE COURT:  It just worked out that way and maybe in
7    retrospect you could have called her last.  I understand.  So you
8    are not leaning with your strongest witness first.  I hear you.  I
9    understand.
10             Ma'am, thank you very much.  You can take your seat.
11             So why don't you come out of the box strong, Mr. Diamond.
12   Come out with your strongest witness.
13             THE WITNESS:  Good afternoon.
14             THE COURT:  Yes, sir.
15             Would you swear in the witness, please.
16   (Witness sworn.)
17                  JUSTUS ARISON, DEFENSE WITNESS SWORN
18                           DIRECT EXAMINATION
19             THE COURT:  Good afternoon to you, sir.
20             THE WITNESS:  Good afternoon.
21             THE COURT:  Tell me your name, please.
22             THE WITNESS:  My name Justus Arison.
23             THE COURT:  Your first name is Justice?
24             THE WITNESS:  Yeah; J-U-S-T-U-S.
25             THE COURT:  -T-U-S?
```

```
 1              THE WITNESS:  Yeah.

 2              THE COURT:  All right.  Spell your last name, please.

 3              THE WITNESS:  A-R-I-S-O-N.

 4              THE COURT:  A-R-I-S-O-N.  And where do you live, Mr.

 5  Arison?

 6              THE WITNESS:  I live in South Miami.

 7              THE COURT:  Of what country are you a citizen?

 8              THE WITNESS:  America.

 9              THE COURT:  You are a citizen of the United States?

10              THE WITNESS:  Yes, sir.

11              THE COURT:  Do you work?

12              THE WITNESS:  Yes.  I'm self-employed.

13              THE COURT:  Doing what?

14              THE WITNESS:  Music production.

15              THE COURT:  Do you have any kind of criminal record, either

16  here or anywhere else in the world?

17              THE WITNESS:  No, sir.

18              THE COURT:  How do you know Mr. Myrie?

19              THE WITNESS:  I've known Andrew since before I can

20  remember.  My father and his parents were very close and they had a

21  couple different businesses together.  So I've known him since

22  birth, really.

23              THE COURT:  So more or less how many years would that be?

24              THE WITNESS:  I'm 27; 27 years.

25              THE COURT:  All right.  And I notice -- at least I think I
```

1   notice a little bit of an accent.  What kind of an accent is that?

2           THE WITNESS:  Yeah, I grew up partially in Jamaica for many

3   years as well.  We lived in the same house under the same roof,

4   everything, you know.

5           THE COURT:  You and Mr. Myrie lived in the same house?

6           THE WITNESS:  We went to the same school.  We also went to

7   the same university, Full Sail in Orlando, for music.

8           THE COURT:  Do you own any real estate?

9           THE WITNESS:  I do.

10          THE COURT:  You do?

11          THE WITNESS:  Yes.

12          THE COURT:  Where?

13          THE WITNESS:  South Miami.

14          THE COURT:  Is that the house that you currently live in?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  What is the address there?

17          THE WITNESS:  8330 Southwest 64th Street, Miami, Florida

18  33143.

19          THE COURT:  Is that a house or an apartment?

20          THE WITNESS:  House.

21          THE COURT:  What is the fair market value of that house?

22          THE WITNESS:  I'm guessing probably somewhere around 1.5

23  million, I think.

24          THE COURT:  Any liens on it?

25          THE WITNESS:  No.

1          THE COURT:  You own it outright?

2          THE WITNESS:  Yep.

3          THE COURT:  Do you own any other real estate other than the

4    house on 64th Street?

5          THE WITNESS:  Yeah, I own a condo in Jamaica worth about

6    somewhere around $220,000.

7          THE COURT:  I may have asked you this question before and

8    if I did, please forgive me for asking it again.

9          Do you have any criminal record anywhere in the world?

10         THE WITNESS:  No.

11         THE COURT:  Do you have a college degree?

12         THE WITNESS:  No.  I actually dropped out.  Andrew

13   graduated and I dropped out.  So I'm working on the GED.

14         THE COURT:  So you are willing to be a cosigner on the

15   bond?

16         THE WITNESS:  For sure.

17         THE COURT:  And you heard the explanation that I gave a few

18   minutes ago about the consequences of that.

19         Are you, also, willing to be a cosigner on the bond if it

20   means that you would not be able to sell, transfer, convey, lien, or

21   do anything with that real estate?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Now, let me ask a followup question.

24         I do not know if you are the person -- but Mr. Diamond

25   earlier in your presentation when you were starting to give me a

1  preview of your closing argument, but it was really in your opening,

2  you indicated that there would be somebody here in the United States

3  who is willing to have Mr. Myrie live with that person in the United

4  States.

5          And I am going to go out on a limb and guess that it is Mr.

6  Arison; is that right?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  All right.  And Mr. Arison, how many bedrooms

9  are in your house?

10          THE WITNESS:  There is one, two, three bedrooms -- yeah,

11  three bedrooms.

12          THE COURT:  And who else lives with you?

13          THE WITNESS:  Just my girlfriend and our baby.

14          THE COURT:  So is there an extra bedroom in the house?

15          THE WITNESS:  Yes.

16          THE COURT:  And you have already spoken to your girlfriend

17  about Mr. Diamond's suggestion that if Mr. Myrie were to be released

18  on bond, he would be staying at your house?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  What is the name of your girlfriend?

21          THE WITNESS:  Her name is Tashna Templer.

22          THE COURT:  Her first name, again?

23          THE WITNESS:  T-A-S-H-N-A.

24          THE COURT:  Last name?

25          THE WITNESS:  T-E-M-P-L-E-R.

1          THE COURT:  Does the Government have any questions for Mr.

2  Arison?

3          MS. CHOE:  No, Your Honor.

4          THE COURT:  All right.  Anything further, Mr. Diamond, from

5  this witness?

6          MR. DIAMOND:  No, sir.

7          There are other assets I would like the Court to be aware

8  of.  The last name may not mean anything in and of itself, but the

9  Arison family, I think, is quite prominent in this community.  I

10 have a letter from Michael Arison who could not be here.  Again, the

11 letter indicates:

12          "My name is Michael Arison.  I live in North Florida.  I

13 was not able to attend the hearing today.

14          However, I want it to be known that I have known Andrew's

15 family for many years and Andrew since he was two years old.  While

16 in Jamaica, I lived with his family for over ten years.

17          I also paid for Andrew's education at Full Sail in Orlando,

18 Florida, from where he graduated with honors.  He is currently a

19 very highly regarded music producer in Jamaica and leading the

20 charts for quite some time.

21          I am extremely confident Andrew will obey the Court's

22 requirements and not flee.  Andrew is not a threat to anyone.  I

23 will assure you that he will do as he is instructed.  I stand behind

24 Andrew with no hesitation and I will provide housing for him if he

25 is required to stay in Florida until the date of his court

1  appearance."

2          It is signed, sincerely, Michael A. Arison, and it was

3  notarized.

4          THE COURT:  What is the connection between Michael Arison

5  and Justus Arison?

6          THE WITNESS:  That's my father.

7          MR. DIAMOND:  That is Arison from Carnival Cruise.

8          So the Court doesn't think a young man, 27, who has the

9  ability to own a home of that value may have received -- it is all

10 vetted for and will be vetted for by way of --

11         THE COURT:  So Mr. Arison, let me ask you this.

12         I heard Mr. Diamond say that the name Arison is a well

13 known name in the community.

14         So my best understanding is that the primary owner, for

15 example, of the Miami Heat is a fellow named Micky Arison.  Is Micky

16 Arison in any way related to you?

17         THE WITNESS:  Yes, that's my uncle.

18         THE COURT:  That is your uncle?

19         THE WITNESS:  Yes.

20         THE COURT:  Okay.  So your father is Michael Arison?

21         THE WITNESS:  Yeah.

22         THE COURT:  And Michael Arison is brothers with Micky

23 Arison?

24         THE WITNESS:  Yeah.

25         THE COURT:  And Michael is an executive with Carnival

1  Cruise Lines?

2         THE WITNESS:  No.  Michael isn't affiliated with the

3  Carnival Company, no.  He has his own company.

4         THE COURT:  I see.  And so, I am really going back to test

5  my memory, but I believe that Micky Arison's father is or was --

6         THE WITNESS:  Ted.

7         THE COURT:  Ted Arison?

8         THE WITNESS:  Yeah.

9         THE COURT:  And that is also, like, your great uncle or

10 something like that?

11        THE WITNESS:  That's my grandfather.

12        THE COURT:  Your grandfather?

13        THE WITNESS:  Yeah.

14        THE COURT:  So I am going to guess that you are a Miami

15 Heat fan?

16        THE WITNESS:  For life.

17        THE COURT:  Well, we are not going to talk about what's

18 going on now.

19        THE WITNESS:  It's been depressing, but let's not go there.

20        THE COURT:  All right.  You may return to your seat, Mr.

21 Arison.  Thank you so much for your help.

22        Any other witnesses, Mr. Diamond?

23        MR. DIAMOND:  Yes.  If I can, I also have a gentleman who,

24 as I said, flew in so that he could be here on behalf of Andrew.

25        Come on up, Mr. Plunkett.

1          THE COURT:  Good afternoon, sir.

2          THE WITNESS:  Good afternoon, Judge Goodman.

3          THE COURT:  And would you please swear in the witness.

4  (Witness sworn.)

5               WILLIAM PLUNKETT, DEFENSE WITNESS SWORN

6                         DIRECT EXAMINATION

7          THE COURT:  Tell me, please, your name.

8          THE WITNESS:  William Plunkett.

9          THE COURT:  Spell the last name, sir.

10         THE WITNESS:  P-L-U-N-K-E-T-T.

11         THE COURT:  And where are you from, sir?

12         THE WITNESS:  Born and raised here in Miami.

13         THE COURT:  I heard Mr. Diamond say that you flew in from

14  out of town?

15         THE WITNESS:  Yes, I did.

16         THE COURT:  All right.  Were you on vacation, or what does

17  that mean that you flew in from out of town?

18         THE WITNESS:  I'm the portfolio manager for the Arison

19  family.

20         THE COURT:  Do you live in Miami?

21         THE WITNESS:  I live in Key Largo.

22         THE COURT:  You live in Key Largo?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  All right.  And you happened to be out of town?

25         THE WITNESS:  I have an office and home on the Arison ranch

1 in North Florida.

2          THE COURT:  Do you know the Defendant?

3          THE WITNESS:  Very well since about six years old.

4          THE COURT:  How?

5          THE WITNESS:  Primarily through the father and through

6 different businesses that we participated in.

7          THE COURT:  What do you mean through the father?

8          THE WITNESS:  Through Michael Arison.

9          THE COURT:  Okay.  Fine.

10         Okay.  So you have known him since he was six?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  And do you have any kind of

13 criminal record?

14         THE WITNESS:  No, sir.

15         THE COURT:  You are a college graduate?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Where?

18         THE WITNESS:  University of Florida.

19         THE COURT:  What year, sir?

20         THE WITNESS:  '60 -- no, '71.

21         THE COURT:  '71 you graduated.

22         All right.  So that was back in the Charley Pell era of

23 football.

24         THE WITNESS:  Ray Graves.

25         THE COURT:  Ray Graves.  Was the team lousy back then or

1    was it any good?

2            THE WITNESS:  No, it was very good.  It won the ACC

3    championship my first year there.

4            THE COURT:  My gosh, I was there from '73 to '77 and the

5    team was horrible.

6            Any postgraduate education?

7            THE WITNESS:  No.

8            THE COURT:  I am guessing you graduated with a degree in

9    business?

10           THE WITNESS:  Actually, marketing.

11           THE COURT:  Marketing?

12           THE WITNESS:  Uh-huh.

13           THE COURT:  All right.  Now, the home that you have in Key

14   Largo, do you own that?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  What is the address?

17           THE WITNESS:  233 Buttonwood Shores Drive.

18           THE COURT:  That sounds like the kind of street we would

19   find in Key Largo, Buttonwood Shores Drive.

20           Is that a house, an apartment, a townhouse?

21           THE WITNESS:  It's a house.

22           THE COURT:  Do you own it outright or are there any liens

23   on it?

24           THE WITNESS:  You mean mortgage?

25           THE COURT:  Yes, sir.  Mortgage.

```
 1              THE WITNESS:  I think the mortgage is about $150,000.

 2              THE COURT:  And what is the value of the property?

 3              THE WITNESS:  $600,000 or $700,000.

 4              THE COURT:  Do you own any other property besides the Key

 5  Largo property?

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  Where?

 8              THE WITNESS:  I have two rental properties in Key Largo and

 9  I have a ranch over outside Naples.

10              THE COURT:  So the two rental properties that you have in

11  Key Largo, are those apartments?

12              THE WITNESS:  Yes, they are.

13              THE COURT:  Condominiums?

14              THE WITNESS:  No.  They're houses that are a duplex and a

15  triplex.

16              THE COURT:  One duplex and one triplex?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  What are the addresses there, please?  First

19  the duplex.

20              THE WITNESS:  I'm sorry, Your Honor.  I don't know those.

21  My wife handles all of that.  She's a real estate broker and I don't

22  know that.

23              THE COURT:  All right.  Same thing for the triplex, you are

24  not sure of the exact address?

25              THE WITNESS:  Yes.
```

1          THE COURT:  Fair enough.

2          Do you own the duplex and the triplex yourself, or is it

3    co-owned with your wife, or is it owned in the name of a

4    corporation, LLC, or other entity?

5          THE WITNESS:  Both properties are co-owned with myself and

6    my wife.

7          THE COURT:  All right.  And the first property that you

8    told me about, the one that is on Buttonwood Shores Drive, is that

9    owned by yourself individually, or co-owned with your wife, or some

10   other situation?

11         THE WITNESS:  Co-owned.

12         THE COURT:  What is your wife's name?

13         THE WITNESS:  Beverly Middleton.

14         THE COURT:  And the ranch that you own in Naples, what is

15   the address?  Well, let me backtrack for a minute.

16         The duplex and the triplex, any mortgages on those

17   properties?

18         THE WITNESS:  Yes, $100,000 on the duplex and I believe

19   $350,000 on the triplex.

20         THE COURT:  And what is the fair market value of the

21   duplex?

22         THE WITNESS:  Probably $300,000.

23         THE COURT:  And the fair market value of the triplex?

24         THE WITNESS:  $550,000.

25         THE COURT:  You also indicated that you own a ranch in

1 Naples.  So what is the address there?

2          THE WITNESS:  Oh --

3          THE COURT:  It has to be some name like Rolling Ranch Drive

4 or something like that.

5          THE WITNESS:  No.  It's Jones Gray Road.  I'm the only

6 ranch on it.

7          THE COURT:  Jones Gray Road?

8          THE WITNESS:  Yes, there's 160 acres.

9          THE COURT:  160 acres.  All right.  You own it by yourself

10 or with your wife?

11          THE WITNESS:  I own it as an LLC by myself in the name of

12 Fakahatchee Land and Cattle Company LLC.

13          THE COURT:  Fakahatchee Land and Cattle Company LLC?

14          THE WITNESS:  Correct.

15          THE COURT:  And are you the only member of that LLC?

16          THE WITNESS:  Yes -- or no, I gifted my daughter a one

17 percent -- I began a gift this year for tax purposes.

18          THE COURT:  Any mortgage on that property?

19          THE WITNESS:  None.

20          THE COURT:  What is the fair market value?

21          THE WITNESS:  A million, a million two.

22          THE COURT:  So you heard, before, the comments I was making

23 about the consequences of being a cosigner on the bond?

24          THE WITNESS:  Yes, Your Honor.  I understand.

25          THE COURT:  All right.  And so Mr. Plunkett, you are

1 willing to be a cosigner on the bond?

2          THE WITNESS:  Yes, I am.

3          THE COURT:  And you are willing to agree not to sell, or

4 transfer, or convey, or do anything to affect the title to the home

5 on Buttonwood Shores Drive, the duplex, the triplex, and the ranch?

6          THE WITNESS:  That is correct.

7          THE COURT:  Does the Government have any questions for Mr.

8 Plunkett?

9          MS. CHOE:  No, Your Honor.  Thank you.

10          THE COURT:  Mr. Diamond, is there anything further you

11 would like to bring out from Mr. Plunkett?

12          MR. DIAMOND:  No, Your Honor.

13          THE COURT:  All right.  Thank you, Mr. Plunkett, you may

14 step down and go back to your seat.

15          THE WITNESS:  Thank you.

16          THE COURT:  All right.  Next witness, please.

17          MR. DIAMOND:  Your Honor, there are others here, but

18 without assets.  They wanted the Court to know how they stand behind

19 Andrew.  That's why I started off with Zoe Espitia, I think.

20          THE COURT:  All right.

21          MR. DIAMOND:  She lives in the U.S.A.  She's from

22 Hollywood, Florida, and knows him for seven years.  She is a

23 divorced mother of one.

24          THE COURT:  All right.  Mr. Diamond, just bear with me for

25 a minute.

1          Ma'am, come up to the podium, please.

2          Swear in the witness.

3   (Witness sworn.)

4              ZOE ESPITIA, DEFENSE WITNESS SWORN

5                    DIRECT EXAMINATION

6          THE COURT:  Tell me your name, please.

7          THE WITNESS:  Zoe.

8          THE COURT:  Spell the first name.

9          THE WITNESS:  Z-O-E.

10         THE COURT:  And spell the last name, please.

11         THE WITNESS:  E-S-P-I-T-I-A.

12         THE COURT:  Where do you live?

13         THE WITNESS:  Hollywood, Florida.

14         THE COURT:  Specifically, where do you live?

15         THE WITNESS:  Oh, 2115 North 15th Avenue.

16         THE COURT:  Is it a house or an apartment?

17         THE WITNESS:  A house.

18         THE COURT:  Do you own it?

19         THE WITNESS:  No, I rent.

20         THE COURT:  Do you work?

21         THE WITNESS:  Yes.

22         THE COURT:  What do you do?

23         THE WITNESS:  I own a digital distribution company.

24         THE COURT:  What does that mean?

25         THE WITNESS:  Okay.  So we have direct agreements with

1  companies like iTunes and Amazon and we distribute independent

2  artists, producers, and record labels music on-line worldwide.

3            So we're signed with -- we partner with the record label

4  and the producer and the independent artist and we distribute their

5  music on-line through a digital service provider like iTunes.

6            THE COURT:  So this would be a lot different than me buying

7  a 45.

8            THE WITNESS:  It's all air.

9            THE COURT:  All right.  So how long have you known Mr.

10 Myrie?

11           THE WITNESS:  For about seven years.

12           THE COURT:  Do you have any kind of criminal record?

13           THE WITNESS:  No.

14           THE COURT:  Now, I know that Mr. Diamond candidly explained

15 to me that you do not own a house or have any significant assets,

16 but setting that aside, are you willing to be a cosigner on a bond

17 for Mr. Myrie?

18           THE WITNESS:  Yes.

19           THE COURT:  Does the Government have any questions of Miss

20 Espitia?

21           MS. CHOE:  No, Your Honor.

22           THE COURT:  Mr. Diamond, anything further from you?

23           MR. DIAMOND:  No, Your Honor.

24           THE COURT:  Thank you, ma'am.  You may step down.

25           MR. DIAMOND:  If I may have one moment, please.  I just

1  want to clarify one thing.

2          THE COURT:  Sure.  You bet.

3          MR. DIAMOND:  Thank you.

4          I don't have anything further, Your Honor.

5          THE COURT:  All right.  So thank you for that.

6          I think you were are in the midst, in effect, of making

7  your closing argument.  And then, when you started to mention the

8  people who were here to support Mr. Myrie, I said let's call them up

9  to the podium and they have done that.

10         So you can, please, continue with your argument if you have

11 anything further to add above and beyond what you have already told

12 me and above and beyond what I have already heard from the witnesses

13 who are willing to be cosigners.

14         MR. DIAMOND:  Yes.  The Court has heard it.

15         There are very substantial people and substantial people

16 without assets who are willing to sign who have that much faith and

17 confidence in Mr. Myrie's ability to abide by any and all conditions

18 this Court places upon him.

19         And I think this Court has the ability to set a bond that

20 will assure his further appearance in all proceedings.  As the

21 Government has already said, clearly there is extradition.  It's not

22 that he's going anywhere.  He will have a place to live.  You can

23 place whatever conditions you want, as much reporting as Pretrial

24 Services may require, electronic monitoring.

25         I mean, there are so many conditions that could be placed

1  on him.  He is so far way above in terms of his financial ability to

2  satisfy conditions of bail by his friends who stand strongly behind

3  him that I would ask the Court to set a reasonable bond on his

4  behalf so that he can assist me in my representation of him in North

5  Dakota.

6          THE COURT:  Thank you.

7          Do you have something further?

8          MS. CHOE:  I would just add that while the Defendant

9  clearly has access to assets and resources to secure a bond, those

10 can also be used to secure flight and there is still a detainer

11 against him.

12         THE COURT:  Well, thank you.

13         I understand that Mr. Diamond is well aware of the detainer

14 and he is well aware that if he succeeds here, that is only the

15 first battle.  Then, he has the battle with the immigration

16 officials over at Krome.

17         So I am going to deny the Government's request for Pretrial

18 Detention because I find that there are, in fact, a combination of

19 conditions which will assure the Defendant's presence and will

20 demonstrate that he is not going to be a danger to the community.

21         And in fact, the Government did not even argue danger to

22 the community.  When I asked you at the beginning the grounds for

23 Pretrial Detention, you said only risk of flight.

24         Now, let me just put a couple of comments on the record,

25 which actually everything I say is on the record.  So of course, it

1 is for the record, but I have been doing this job now as a federal

2 magistrate judge for four and-a-half years.

3       And I have to tell you, Mr. Diamond, that -- I may be

4 mistaken and I am giving myself a little bit of a safety valve if I

5 am wrong, but I am tempted to say this is really the most impressive

6 presentation that I have ever seen on a bond.

7       The nature of the people that you have put up to be

8 cosigners, their financial background, their academic background,

9 their standing in the community, the lack of criminal history, it is

10 really quite impressive especially for somebody who is not a U.S.

11 citizen and who spends most of the time in Jamaica.

12       So it is comparatively remarkable, given everything that I

13 have seen over the years.  Most of the time when a defendant is a

14 foreign national it is extremely difficult for a Court to deny a

15 Pretrial Detention request because the person has no ties in the

16 United States.

17       And also, as a practical matter, has no place to live, but

18 you have worked it out with all of these fine folks.  And you have

19 pinpointed a perfectly appropriate place for your client to live in

20 here in South Miami, assuming you can get beyond the immigration

21 hold and, then, assuming they would have to go out to North Dakota

22 and deal with the judge out there.

23       So even though I am rejecting the Government's Pretrial

24 Detention request, I have to tell you, given the nature of the case

25 it is already an indicted case.  Given the fact that your client is

1  not a U.S. national, I am going to have to impose a series of

2  conditions.  It will be a multifaceted bond, but I think it will be

3  sufficient to address the Government's concerns about the risk of

4  flight.

5       So this will be a $500,000 personal surety bond to be

6  cosigned by the following individuals.  First, it will be cosigned

7  by Davetta Davis.  It will be cosigned by Justus Arison.  It will be

8  cosigned by Michael Arison.  It will -- I'm tempted to say it will

9  be cosigned by Dwayne Wade, but perhaps that is going a little

10 extreme.  It will be cosigned by William Plunkett and it will be

11 cosigned by Zoe Espitia.

12      For all of those cosigners who own real estate and their

13 substantial real estate involved, all the cosigners must agree not

14 to sell, transfer, convey, hypothecate, et cetera, the real estate

15 that they own, either directly or indirectly through a corporate

16 entity or LLC and may not do anything to affect the title to that

17 real estate.

18      In addition, Mr. Myrie must surrender his passport and

19 travel documents and may not seek or apply for any passport or

20 travel documents.  He must report to Pretrial Services as directed.

21 He must -- you may not -- I should phrase it this way.  You may not

22 visit any commercial transportation establishment.

23      Were you listening and paying attention, Mr. Myrie, earlier

24 this afternoon when I explained to other defendants in other cases

25 what it means to not visit commercial transportation establishments?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you need me to explain that again or do you

3    understand?

4          THE DEFENDANT:  I understand, sir.

5          THE COURT:  All right.  Then, that applies to you as well.

6          In addition, you will be on home confinement with an

7    electronic monitor.

8          I should say, first of all, you will be living -- assuming

9    that Mr. Diamond is able to clear all of these other hurdles -- you

10   will be living in South Miami at the home of Justus Arison.

11         Mr. Arison, Justus Arison, is there a landline, sir, at

12   your home?  Do you understand what I mean by a landline?

13         THE WITNESS:  Yes, there is.

14         THE COURT:  Like an old fashioned -- okay.

15         THE WITNESS:  I know what you're saying, but it's there.

16         THE COURT:  And it works?

17         THE WITNESS:  Yes, it works.

18         THE COURT:  You will have to live at Mr. Arison's home in

19   South Miami.  You will be restricted to the home and you will be on

20   electronic monitoring to be paid by you.  You may leave the home

21   only for the following purposes.

22         Number one, to visit with your attorney or a member of your

23   attorney's staff, such as an associate, investigators, paralegals,

24   et cetera.  Also, to appear in court.  So your bond release will be

25   limited to the Southern District of Florida and the District of

1 North Dakota.

2        Is North Dakota one of those districts where there is only

3 one district in the entire state?

4        There is.  It will be limited to the Northwestern Division,

5 which I think is where the case is pending and any other locations

6 that you need to travel through in order to get from Miami to court

7 in North Dakota.

8        So I do not know how you fly from Miami to North Dakota.  I

9 do not know if there are any direct flights, but if you have to fly

10 from here to Atlanta and then Atlanta to North Dakota, or to Chicago

11 or here, any other city.  My point is you are permitted to go to

12 those areas to travel, but only for the purposes of traveling to the

13 District of North Dakota.

14        So just so we are clear, assume for the sake of discussion,

15 that you fly normally from here to Dallas to North Dakota, you may

16 do that if you are doing that in order to go to North Dakota.  You

17 cannot simply fly to Dallas just because you feel like going to

18 Dallas, or you feel like going to Dallas to Los Angeles to visit

19 your girlfriend.

20        Do you understand that you are only allowed to pass through

21 those districts for the sole purpose of appearing in court?

22        Do you understand that?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  All right.  In addition, you will be able to

25 leave the house with a scheduled appointment with a doctor or a

1 healthcare practitioner.  You will be able to leave the home for a

2 medical emergency.  You will be able to leave the home for a

3 scheduled religious service if you are so inclined.

4         Now, assuming Mr. Diamond clears all of these hurdles and

5 you are, in fact, released and living at Mr. Arison's home in South

6 Miami, other than one of the limited exceptions, one or more of the

7 limited exceptions that I have listed for you, you have to be at the

8 house.

9         And I want to make absolutely certain that you understand

10 precisely what that means.  When I mean you have to stay at the

11 house, I mean you have to stay at the house.  You cannot be down the

12 block at Seven Eleven buying a bottle of soda, even if it takes you

13 four minutes.  You cannot go down the street to pick up a cup of

14 coffee at Starbucks on Sunset Drive in South Miami, even if it takes

15 you ten minutes.  You have to stay at the house.  You cannot even be

16 across the street visiting with a neighbor.

17         Let's say the neighbor, Mr. Arison's neighbor, is having a

18 barbecue in their back yard and you are 50 yards away across the

19 street, that is a violation of the bond.

20         Do you understand that?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  All right.  Are there any other special

23 conditions suggested by the U.S. Attorney's Office?

24         MS. CHOE:  No, Your Honor.

25         THE COURT:  Are there any other special conditions

1  suggested by Miss Silva?

2          THE PROBATION:  Yes, Your Honor.

3          THE COURT:  Yes, tell me.

4          THE PROBATION:  Will the Court consider substance abuse

5  testing and/or treatment?

6          THE COURT:  Let me check the Pretrial Services Report and

7  see if there is a need for that.  Bear with me for just a minute.

8          Yes, you will also be required to undergo a substance abuse

9  testing and/or treatment as required by Pretrial Services.  I

10  understand, Mr. Myrie, you may have heard that in some parts of the

11  country the marijuana laws have been loosened, such as in Colorado.

12  We are not in Colorado.  We are in Florida.

13          And you may come from a country where marijuana use is

14  socially accepted, but here in this country and in Florida it is a

15  crime.  So you may not smoke marijuana or do any other kind of

16  illegal drug.

17          And at the request of Pretrial Services, you will have to

18  go -- you will have to undergo drug testing.  So what that will mean

19  is when you appear they may say to you, you need to produce a urine

20  sample.  And you better make sure that that test comes back

21  negative.

22          Do you understand?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Any other conditions that you are suggesting?

25          THE PROBATION:  Your Honor, as to the condition to avoid

1   commercial transportation establishment with the exception of him

2   traveling to North Dakota for court purposes.

3          THE COURT:  Right.  Thank you.  Very good point.

4          You cannot go to airports, seaports, et cetera, with the

5   exception of going there for a trip to North Dakota for a court

6   required appearance.

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Miss Silva, anything else?

9          THE PROBATION:  No, thank you.

10          THE COURT:  All right.  And so Mr. Horne, you are the

11   postal inspector from North Dakota?

12          THE WITNESS:  I'm local.

13          THE COURT:  I thought you were from North Dakota.

14          THE WITNESS:  No, I'm local.

15          THE COURT:  I was going to say even though you are in North

16   Dakota, you could arrange to stay another week because it is

17   probably 15 degrees in North Dakota.

18          So anything further this afternoon from either side

19   concerning Mr. Myrie?

20          MS. CHOE:  Yes, Your Honor.

21          I have been asked by the prosecutor in North Dakota in

22   light of the Court's order to move for a stay of your release order

23   pending review of the order by the Court having original

24   jurisdiction in the District of North Dakota.  That request is made

25   pursuant to Title 18, United States Code, Section 3145(a)(1).

1          THE COURT:  All right.  Mr. Diamond?

2          MR. DIAMOND:  I would object.

3          THE COURT:  I see that and it is duly noted, but I am going

4   to grant the Government's request for a stay.  So that does not

5   surprise me they are asking for a request for a stay.

6          What I would ask is that the Government please order the

7   transcript of this hearing because all of the reasons supporting my

8   ruling are there.  All the testimony from the supporting witnesses

9   will be there.  And I think it is important for the reviewing court

10  to understand what happened here and the reasons for the ruling.

11         And so, in any event, Mr. Myrie, let me just say, Mr.

12  Diamond has done a masterful job representing your interest here.

13  He has convinced me to reject the Government's Pretrial Detention

14  request.

15         Just so you understand what is happening here, the

16  Government is not only unhappy with my ruling, but the local U.S.

17  Attorney's Office is, in effect, acting at the request of the U.S.

18  Attorney's Office in North Dakota.  They are the office prosecuting

19  the case.  They have asked our local assistant U.S. attorney to ask

20  me for a stay of my ruling to give the Government the opportunity to

21  challenge my ruling, which I guess they are going to do.

22         So although Mr. Diamond has gained some victory right now,

23  it is only going to be a temporary victory because the Government is

24  going to be taking me up, so to speak.  So that is procedurally

25  where we are.

1          All right.  Is there anything further from either side this

2   afternoon?

3          MS. CHOE:  No, thank you, Your Honor.

4          THE COURT:  All right.  Thank you so much.  We are in

5   recess.  And I note for the record that the air conditioning is

6   still not working.

7          All right.  Thank you.

8          (Thereupon, the proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


        I hereby certify that the foregoing audio recorded
transcript is an accurate transcript of the proceedings in the
above-entitled matter.



02/13/15                        Bonnie Joy Lewis,
                        Registered Professional Reporter
                           CASE LAW REPORTING, INC.
                           7001 Southwest 13 Street,
                         Pembroke Pines, Florida 33023
                              954-985-8875